

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE OCT 05 2017

Fairhurst. CJ
CHIEF JUSTICE

This opinion was filed for record

at 8:00 am on Oct 5, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| CORTNEY L. BLOMSTROM, <br><br> Petitioner, <br><br> v. <br><br> The Honorable GREGORY J. TRIPP, in his official capacity as a Spokane County District Court Judge, and the SPOKANE COUNTY DISTRICT COURT, <br><br> Respondents. | No. 91642-0 <br><br> En Banc <br><br> Filed OCT 0 5 2017 . |
| BROOKE M. BUTTON, <br><br> Petitioner, <br><br> v. <br><br> The Honorable GREGORY J. TRIPP, in his official capacity as a Spokane County District Court Judge, and the SPOKANE COUNTY DISTRICT COURT, <br><br> Respondents. | |
| CHRISTOPHER V. COOPER, <br><br> Petitioner, <br><br> v. <br><br> The Honorable GREGORY J. TRIPP, in his official capacity as a Spokane County District Court Judge, and the SPOKANE COUNTY DISTRICT COURT, <br><br> Respondents. | |

WIGGINS, J.—This case involves three driving under the influence (DUI) defendants challenging their pretrial urinalysis testing conditions. Each defendant was arrested for DUI, and each was ordered to participate in random urinalysis testing as a condition of pretrial release. The defendants challenged their testing conditions by petitioning for a writ of review with the Spokane County Superior Court. The superior court denied the applications for a writ.

We reverse the decision of the superior court. We hold that Cortney Blomstrom, Brooke Button, and Christopher Cooper are entitled to statutory writs of review because they lack an adequate remedy at law to challenge their pretrial release conditions and because their urinalysis testing requirements contravene article I, section 7 of the Washington State Constitution.

FACTS AND PROCEDURAL HISTORY

Each of the three petitioners was arrested for driving under the influence (DUI). Two petitioners had high blood alcohol concentrations (BAC) but no previous DUI arrests, while the third petitioner had allegedly used marijuana and had a previous DUI conviction.

A. Blomstrom

Cortney Blomstrom was arrested for DUI on February 1, 2015.[1] Clerk's Papers (CP) at 39. A breath test showed a BAC[2] of 0.191 and 0.184. Verbatim Report of

---

[1] DUI is a gross misdemeanor, except in specific circumstances not applicable here. RCW 46.61.502.

[2] BAC is calculated as grams of alcohol per 210 liters of breath. RCW 46.61.506(2)(a). The legal limit in Washington is 0.08 BAC. RCW 46.61.502(1)(a).

Proceedings (RP) Feb. 2, 2015 (RP Blomstrom) at 1. Blomstrom had no criminal record. *Id.* at 2.

At Blomstrom's first appearance, the State requested four times monthly random urinalysis testing as a condition of release. *Id.* The State pointed to a series of studies by the United States Department of Transportation's National Highway Traffic Safety Administration (NHTSA), which found that an individual with a BAC over 0.15 is "fa[r] more likely to be involved in a fatal car crash as well as more likely to reoffend."[3] *Id.* Blomstrom objected, citing her lack of criminal record and arguing that the other conditions—requiring "nonuse, possession, or consumption [of alcohol and drugs]"—were adequate to protect public safety. *Id.*

> The court imposed twice monthly random urinalysis testing, concluding that
>
> [b]ecause of the high BAC, because of the facts of this case, because of the argument of counsel I do find that there is a likelihood that you would reoffend and . . . possibly believe consuming alcohol would be a risk to public safety as well.

*Id.* at 3. The court further ordered Blomstrom to abstain from possessing or using any alcohol or unprescribed drugs. *Id.*

### B. Cooper

Christopher Cooper was arrested for DUI on February 7, 2015. CP at 26. The arresting officer noted an open bottle of whiskey on the floorboard, about a quarter empty; Cooper allegedly admitted "that he had just come from a bar." RP Feb. 9,

---

[3] NHTSA, U.S. DEP'T OF TRANSP., PUB NO. 811870, TRAFFIC SAFETY FACTS: ALCOHOL-IMPAIRED DRIVING: 2012 DATA (Dec. 2013); NHTSA, U.S. DEP'T OF TRANSP., PUB NO. 812101, TRAFFIC SAFETY FACTS: ALCOHOL-IMPAIRED DRIVING: 2013 DATA (Dec. 2014); NHTSA, U.S. DEP'T OF TRANSP., PUB NO. 812350, TRAFFIC SAFETY FACTS: ALCOHOL-IMPAIRED DRIVING: 2015 DATA (Dec. 2016).

2015 (RP Cooper) at 2. Cooper's breath test registered a BAC of 0.175 and 0.174. *Id.* at 1. Cooper had never been convicted of an alcohol- or drug-related offense and had no prior DUI arrests. CP at 26-28.

At Cooper's first appearance, the State requested four times monthly random urinalysis testing as a condition of release. RP Cooper at 1. Again, the State relied on the NHTSA studies "indicating that above a .15 [BAC] an individual is far more likely to both reoffend and be involved in a fatal accident." *Id.* at 2. The State also suggested that Cooper's "pretty lengthy driving record . . . would warrant testing." *Id.* at 3.

Cooper's counsel objected, arguing that "there's no indication he wouldn't follow the Court's orders not to use, possess, or consume [alcohol] or that he would be a danger to society or reoffend . . . ." *Id.* Counsel further objected to the testing requirements "on *State v. Rose*[4] grounds." *Id.*

The court imposed four times monthly urinalysis testing based on Cooper's "record[,] . . . the studies which [the prosecutor] has indicated, [and] the high blow which is more than two times the legal limit." *Id.* at 5-6. In light of these findings, the court concluded that "we have to put something in place that will reduce the danger to the community . . . under [Criminal Rules for Courts of Limited Jurisdiction (CrRLJ)] 3.2(d)(10). So, that's what I'm going to do in this case." *Id.* The court further ordered Cooper to abstain from all use or possession of alcohol or unprescribed drugs. *Id.* at

---

4 146 Wn. App. 439, 191 P.3d 83 (2008) (holding that two defendants' pretrial testing conditions violated court rules and that a third defendant's pretrial testing conditions were unconstitutional).

5-6. The court noted that Cooper could ask the court to reconsider the conditions imposed "at any time." *Id.* at 6.

### C. Button

Brooke Button was arrested for driving under the influence of marijuana. RP Mar. 2, 2015 (RP Button) at 3. Button was arrested over the weekend, at which point probable cause was determined and initial pretrial release conditions were purportedly imposed.[5] *Id.* at 1. Button's first appearance in court was on the following Monday. *Id.*

Button's criminal record largely consisted of minor theft and driving infractions, as well as a 2009 conviction for DUI in Idaho.[6] CP at 92-94; RP Button at 3. There was no evidence concerning the nature of the substance involved in Button's 2009 DUI conviction. RP Button at 5. Button also had three previous charges for failing to install an ignition interlock device (IID)[7] in 2011. CP at 92-94.

At Button's first appearance, the State requested four times monthly random urinalysis testing. RP Button at 2. The State emphasized Button's prior DUI conviction, and described the three charges for failing to install an IID as "a bit troubling . . . from the position of whether or not she's going to follow court orders not to use, possess, or consume" alcohol or drugs. *Id.* at 5. Button's counsel objected, noting that "there was no alcohol in this allegation. It was strictly a marijuana

---

[5] No order is available in the record.

[6] There is no evidence in the record supporting the 2009 Idaho DUI conviction. However, the petitioners also refer to the conviction in briefing. Pet'rs' Opening Br. at 6 (citing the prosecutor's statements at the first appearance hearing).

[7] An ignition interlock device detects alcohol in the breath and, if alcohol is present, renders the vehicle inoperable. RCW 43.43.395(3).

allegation.". *Id.* at 4. Counsel requested that the court not impose the testing requirement. *Id.*

The court agreed with the State that four times monthly urinalysis testing was appropriate:

> I am going to order testing based upon the prior [DUI] . . . and the recency in time and all the other facts that I find to be the facts for the purpose of this hearing as stated by [the prosecutor] and so, you're to contact Absolute Drug Testing within 24 hours for random four times a mont[h] testing. This is based upon [CrRLJ] 3.2 as well as RCW 10.21.030 which allows for that testing and . . . frankly the . . . likelihood of her reoffending. The fact that we've ha[d] three arrests for the ignition interlock violation also is an indication to the Court [that] there should be some . . . testing.

*Id.* at 5-6. However, the court concluded that an IID was unnecessary "because it's not clear to me that both [the current and prior offense] involved alcohol." *Id.* at 6. The court removed the IID requirement from Button's pretrial release conditions. *Id.*

## D. *Applications for Writ of Review*

The petitioners subsequently challenged their pretrial release conditions by applications for a statutory writ to the superior court.[8] CP at 1-2, 32-33, 60-61. The petitioners also filed largely identical supporting memoranda. *Id.* at 3-21, 40-56, 62-84. These memoranda challenged the petitioners' urinalysis testing conditions as violations of CrRLJ 3.2(a), the Fourth Amendment to the United States Constitution, and article I, section 7 of the Washington Constitution. *Id.* at 4, 41, 63.

The superior court rejected the applications for a writ in identical orders. CP at 98, 102, 106. The court declined to comment on the legality or constitutionality of the

---

[8] These three applications were originally accompanied by 14 other petitioners. CP at 98. The record does not reflect why only three petitioners remain on this appeal.

district court's release conditions, concluding instead that a statutory writ was inappropriate because another, adequate remedy was available: "[T]he challenge can only be undertaken by a [Rules for Appeal of Decisions from Courts of Limited Jurisdiction (RALJ)] appeal if [the petitioners] are convicted or plead guilty to the charges." *Id.* at 101.

The petitioners jointly filed a motion for discretionary review of the superior court's decision to this court. Mot. for Discr. Review at 1. The petitioners claimed that the superior court erred in two respects: (1) in finding that the petitioners possessed an adequate remedy in the form of a RALJ appeal and (2) in failing to find that the pretrial release conditions were unconstitutional under state and federal law. *Id.* at 1-2. The petitioners did not challenge the district court's compliance with CrRLJ 3.2 or the validity of any statute that might authorize the imposition of the urinalysis testing conditions. *Id.*; *see also* Pet'rs' Reply Br. (Reply Br.) at 5 ("The petitioners never directly challenged the constitutionality of any statute or court rule, only the district court's orders."). We granted review of the motion without exception.

## STANDARD OF REVIEW

We review de novo a superior court's decision whether to grant a statutory writ of review. *City of Seattle v. Holifield*, 170 Wn.2d 230, 240, 240 P.3d 1162 (2010). Constitutional issues are questions of law that we also review de novo. *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012).

## ANALYSIS

The parties dispute whether the petitioners are entitled to statutory writs of review. A writ shall issue if (1) "an inferior tribunal . . . has exceeded [its] jurisdiction"

or otherwise acted "illegally" and (2) "there is no appeal, nor . . . any plain, speedy and adequate remedy at law." RCW 7.16.040. "Unless both elements are present, the superior court has no jurisdiction for review." *Commanda v. Cary*, 143 Wn.2d 651, 655, 23 P.3d 1086 (2001). We recently clarified that a tribunal acts "illegally" when it

> (1) has committed an obvious error that would render further proceedings useless; (2) has committed probable error and the decision substantially alters the status quo or substantially limits the freedom of a party to act; or (3) has so far departed from the accepted and usual course of judicial proceedings as to call for the exercise of revisory jurisdiction by an appellate court.

*Holifield*, 170 Wn.2d at 244-45.

Whether RCW 7.16.040 provides for a statutory writ in a given circumstance is a question of statutory interpretation. *Id.* Our goal in interpreting a statute is to carry out the legislature's intent. *Burns v. City of Seattle*, 161 Wn.2d 129, 140, 164 P.3d 475 (2007); *see also Hama Hama Co. v. Shorelines Hr'gs Bd.*, 85 Wn.2d 441, 445, 536 P.2d 157 (1975). We begin with the plain meaning of the statute. *See Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). In doing so, we consider the text of the provision, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. *Id.* at 10-11. If the meaning of the statute is plain on its face, then we must give effect to that meaning as an expression of legislative intent. *Id.* If, after this inquiry, the statute remains ambiguous or unclear, it is appropriate to resort to canons of construction and legislative history. *Id.* at 12.

Here, the petitioners assert that they lack an adequate remedy at law and that the district court committed probable error by requiring urinalysis testing and IID

installation, which they claim violated article I, section 7 of the Washington Constitution and the Fourth Amendment to the United States Constitution. Pet'r's Opening Br. (Blomstrom Br.) at 13. The parties do not dispute that the district court's orders substantially limited the freedom of the petitioners to act. *Id.* (claiming that the freedom of the parties to act was substantially limited); *see also* Br. of Resp'ts at 26 (State Br.) (declining to address the issue).

Before addressing the substance of the petitioners' claims, we must first dispose of two threshold concerns: first, whether any party has standing to challenge searches by means of IIDs, as opposed to searches by means of urinalysis testing, and second, whether the petitioners' constitutional challenges were adequately preserved by objection in the district court.

## I. The Petitioners Lack Standing To Challenge IID Requirements

Generally, "[a] person has standing to raise constitutional questions when his interest is a 'personal stake in the outcome of the controversy.'" *Marchioro v. Chaney*, 90 Wn.2d 298, 303, 582 P.2d 487 (1978) (internal quotation marks omitted) (quoting *DeFunis v. Odegaard*, 82 Wn.2d 11, 24, 507 P.2d 1169 (1973). That is, a person challenging a government action must be adversely affected by that action. *See Citizens Council Against Crime v. Bjork*, 84 Wn.2d 891, 893, 529 P.2d 1072 (1975). Thus, in order to challenge an IID search as unconstitutional, at least one of the petitioners in this case must be personally affected by such a search.

The State asserts that *"none* of the [petitioners] were subject to an ignition interlock requirement."[9] State Br. at 9. This is not strictly accurate. One petitioner, Button, was briefly subject to an IID requirement. This order applied between the time of her arrest over the weekend and the time of her first appearance on Monday; at Button's first appearance, the trial court removed the IID. *See* RP Button at 2 (failing to identify who imposed the initial order); *see also id.* at 6 ("I'm not going to order the ignition interlock device at this time . . . ."). While Button was not the subject of an IID search before the requirement was removed, the petitioners claim that this weekend order constitutes grounds for challenging the IID requirement. Reply Br. at 6-7. There are three main problems with this argument.

First, when Button filed her application for a writ of review, no IID requirement existed.[10] *See* CP at 61. Judge Tripp had already withdrawn the condition at Button's first appearance. RP Button at 6. Button thus purports to challenge an order already revoked before her complaint was lodged.[11]

Second, Button's application for a writ of review did not mention an IID requirement. CP at 61. We note that Button's memorandum in support of the writ

---

[9] Amicus Curiae State of Washington expands on the State's argument, urging that the petitioners lack standing because they "have not been affected by the requirements they complain of." Br. of Amicus Curiae State of Washington at 10.

[10] The parties agree that the IID requirement was not in force after the first appearance. *See* Reply Br. at 6 (noting that Button was subject to an IID requirement "on the weekend before her preliminary appearance").

[11] Nor does Button claim that she was subjected to a search before the condition could be removed. Whatever error such a search might have involved was avoided by the order's swift withdrawal.

application ambiguously challenged "the release conditions imposed upon the defendant to subject himself [sic] to an ignition interlock device and/or alcohol monitoring." *Id.* at 62. However, this memorandum itself seemed to be premised on the impression that an IID requirement was ongoing.[12] To the extent that Button's memorandum challenged an IID requirement, it incorrectly purported to challenge an active order; Button did not appear to challenge an order already revoked.

Third, while we can infer the existence of Button's order imposing an IID from the fact that the IID requirement was *removed*, no order imposing an IID is in the record—making it difficult to review any associated reasoning or to conclude that the petitioners were even challenging that order. In this context, it is not clear how a reviewing court could "'provide effective relief.'" *In re Marriage of Horner*, 151 Wn.2d 884, 891, 93 P.3d 124 (2004) (quoting *Orwick v. City of Seattle*, 103 Wn.2d 249, 253, 692 P.2d 793 (1984)). The claim is thus moot.

The petitioners ask that we nonetheless review the case under a mootness exception: in their response to the amicus State of Washington, the petitioners assert that Button's claim is "'not rendered moot and [is] nonetheless justiciable at this point because it is a recurring issue of public importance.'" Pet'r's Ans. to Br. of Amicus Curiae State at 15 (quoting CP at 64). The petitioners explain that "'[a]ll of the district

---

[12] The memorandum addressed the possibility of an order being "subsequently rescinded prior to hearing on this writ"—suggesting that the writer was unaware that Judge Tripp's first appearance order had already removed the IID requirement; there was nothing to "subsequently" rescind when the memorandum was filed. CP at 63. The document also referred to Button's "lack of a criminal record" despite her multiple prior convictions and charges—similarly suggesting a lack of familiarity with the facts of Button's case. *Id.* at 70.

court judges are issuing these orders in many if not most DUI cases.'" *Id.* (quoting CP at 63-64). The petitioners offer no authority for either assertion.

While we occasionally consider issues that become moot during the pendency of a case, "the moot cases which this court has reviewed in the past have been cases which became moot only after a hearing on the merits of the claim." *Orwick*, 103 Wn.2d at 253 (finding that the appellants' claim was moot and emphasizing that no court had yet held a hearing on the merits of the claim). Because Button's claim was moot before any objection was filed, let alone a hearing on her complaint, her claim appears to fall outside the scope of our mootness exceptions.

In sum, although Button was briefly subject to an IID requirement, this requirement was revoked by the time the application for a writ was filed, was not raised in her application for a writ of review, and was not the subject of any order in the record. To the extent that an IID was ordered, it was a mistake withdrawn at Button's first hearing. Because the parties agree that the other petitioners were not subject to IID requirements, the petitioners collectively do not have standing to challenge the use of IIDs as pretrial release conditions. We therefore confine our analysis to the imposition of urinalysis testing as a condition of pretrial release.

II. <u>The Petitioners Preserved Their Constitutional Challenge to Urinalysis Testing</u>

The petitioners claim that urinalysis testing violates their right to privacy under article I, section 7 of the Washington Constitution. The State argues that this claim was not preserved because it "was never raised, argued, briefed, or addressed in the trial court." State Br.at 7. However, at a first appearance before the district court, one

of the petitioners cited to a case discussing the constitutionality of urinalysis testing as a condition of pretrial release. We must now decide whether this citation was sufficient to preserve the constitutional issue for review.

"[T]he purpose of requiring an objection in general is to apprise the trial court of the claimed error at a time when the court has an opportunity to correct the error." *State v. Moen*, 129 Wn.2d 535, 547, 919 P.2d 69 (1996). A party's objection may preserve an issue if the "ground for objection is readily apparent from the circumstances." *State v. Black*, 109 Wn.2d 336, 340, 745 P.2d 12 (1987) (finding that counsel's general objection to an expert's testimony preserved the issue of evidentiary reliability for appeal because the basis for the objection was evident in context); *see also State v. Powell*, 166 Wn.2d 73, 85, 90, 206 P.3d 321 (2009) (plurality opinion) (five justices agreeing that defendant's objection to the mention of drugs before the jury raised, in context, a challenge to the evidence's prejudicial value). In a joint appeal, an error preserved by one party is preserved for all. *See* RAP 2.5(a) ("A party may raise a claim of error which was not raised by the party in the trial court if another party on the same side of the case has raised the claim of error in the trial court.").

Here, Cooper stated the basis for his objection by citing to *Rose*, 146 Wn. App. 439: "we object on *State v. Rose* grounds, your Honor." RP Cooper at 3. The petitioners urge that, in context, this reference was sufficient to invoke the petitioners' constitutional objection.[13] We have not previously weighed the import of citing a case

---

[13] The petitioners also argue that "the ongoing litigation" and the City of Spokane Public Defenders' Office's "routine objections" to urinalysis testing as a pretrial release condition further contextualize Cooper's objection. Reply Br. at 2-3. "[O]ngoing litigation" apparently

as the basis for an objection. Because the implications of Cooper's objection depend on the scope of the Court of Appeals' holding in *Rose*, we first turn to that case.

In *Rose*, the Court of Appeals evaluated three separate defendants' urinalysis testing requirement, each imposed as a condition of pretrial release. 146 Wn. App. at 442. The three defendants—Rose, Wilson, and Wentz—had been charged with various weapon- and drug-possession crimes. *Id.* at 442-44. The court found that, for Rose and Wilson, pretrial urinalysis testing violated CrR 3.2.[14] *Id.* at 453-54. For Rose, there was no evidence supporting a dangerousness finding; and for Wilson, the trial court's concern that the defendant would fail to appear "cannot support the trial court's imposition of weekly [urinalysis] . . . ." *Id.* at 451. For Wentz, the court engaged in extensive constitutional analysis before concluding that his pretrial urinalysis testing violated article I, section 7 and the Fourth Amendment.[15] *Id.* at 455-58.

---

refers to the 14 other petitioners who filed applications for statutory writs of review, and to the allegedly "relentless challenges . . . brought against the unconstitutional pretrial release conditions imposed by the district court." *Id.* at 1. However, we have no evidence in the record of what objections were made by the 14 other petitioners, or of these purportedly "routine" objections made by Spokane's public defenders. Thus, we confine our analysis to the context available in the record—that is, Cooper's first appearance transcript and the implications of his citation to *Rose*.

[14] CrR 3.2(a) requires the release of any person not charged with a capital offense on the accused's own recognizance unless "the court determines that such recognizance will not reasonably assure the accused's appearance . . . or . . . there is shown a likely danger that the accused: (a) will commit a violent crime, or (b) will seek to intimidate witnesses, or otherwise unlawfully interfere with the administration of justice."

[15] The Court of Appeals cited first to article I, section 7 before concluding that "the Washington Constitution provides greater protection to individual privacy rights than does the Fourth Amendment," and then proceeded to rely on the reasoning of a federal case, *United States v. Scott*, 450 F.3d 863 (9th Cir. 2006). *Rose*, 146 Wn. App. at 455-58. In finding a federal constitutional violation in these circumstances, the court logically found a state constitutional violation as well.

Cooper invoked this decision and, by extension, its holdings. RP Cooper at 3. And immediately before invoking *Rose*, Cooper's counsel argued that "there's no indication [that Cooper] wouldn't follow the Court's orders not to use, possess, or consume [alcohol] or that he would be a danger to society or reoffend." *Id.* These factual challenges mirror those in *Rose*, where the trial court lacked evidence of either dangerousness or likely nonappearance. Counsel then concluded his objection to the testing condition: "[W]e object on *State v. Rose* grounds, your Honor." *Id.* The trial court did not respond, proceeding to the State's rebuttal. *Id.*

Under the specific circumstances of this case, and particularly in a court of limited jurisdiction with its concomitant time constraints, we conclude that Cooper's reference to *Rose* necessarily invoked that decision's constitutional analysis. As a result, Cooper adequately preserved his constitutional claim and the petitioners are permitted to collectively raise the issue.

Having resolved the two threshold issues, we now turn to the core question presented: whether the petitioners are entitled to statutory writs of review.

III. <u>The Petitioners Are Entitled to Statutory Writs of Review</u>

To be entitled to statutory writs of review, the petitioners must show that (1) the trial judge committed probable error and (2) there is no other adequate remedy at law. RCW 7.16.040. Because the claim of probable error requires a full analysis of the petitioners' substantive constitutional claims, we address the adequacy of available remedies first.

## A. The Petitioners Lack an Adequate Remedy at Law

RCW 7.16.040 allows parties to challenge "an inferior tribunal" in "any court, except a municipal or district court," where

> an inferior tribunal, board or officer, exercising judicial functions, has exceeded the jurisdiction of such tribunal, board or officer, or one acting illegally, or to correct any erroneous or void proceeding, or a proceeding not according to the course of the common law, and there is no appeal, nor in the judgment of the court, any plain, speedy and *adequate remedy at law.*

RCW 7.16.040 (emphasis added). While we have not declared what constitutes an "adequate remedy" under RCW 7.16.040, we have noted that a remedy may be adequate even if it is not an ideal remedy, and even if it is "attended with delay, expense, annoyance, or even some hardship." *State ex rel. O'Brien v. Police Court of City of Seattle*, 14 Wn.2d 340, 347, 128 P.2d 332 (1942). Two possible remedies are offered in this case: (1) a direct appeal from a court of limited jurisdiction and (2) a motion to amend the conditions of release filed with the district court itself. We conclude that neither provides an adequate remedy for challenging a district court's order imposing pretrial release conditions.

1. A Direct Appeal from a Court of Limited Jurisdiction Is Not an Adequate Remedy at Law To Challenge Pretrial Release Conditions

Initially, the parties disputed whether directly appealing from a court of limited jurisdiction would be sufficient to challenge pretrial release conditions. *See* RP Mar. 20, 2015 at 20 (the State arguing that "direct review or discretionary review" would be the proper paths for petitioners' challenge). By this method, the petitioners would await a final decision from the district court before appealing to the superior court. RALJ 2.2. The superior court determined that such an appeal provided an adequate

remedy. CP at 101 ("[T]he challenge can only be undertaken by a RALJ appeal if [the petitioners] are convicted or plead guilty to the charges."). We disagree.

The superior court mistakenly relied on *Commanda*, 143 Wn.2d 651, as the "leading case interpreting the use of extraordinary writs." CP at 99. In *Commanda*, the defendants in two DUI cases challenged the DUI penalty scheme before trial. This court held that a writ of review was not appropriate because the defendants could appeal the statutory penalty scheme if they were convicted; postconviction consequences were properly challenged by postconviction review. 143 Wn.2d at 657. Here, unlike in *Commanda*, the petitioners challenge *pretrial* orders, not postconviction consequences. If the petitioners must wait until the case is concluded in the district court, then they must either endure the allegedly unconstitutional search and seizure or sit in jail pending trial, after which point an appeal from the final resolution will not cure the pretrial violation. Only a pretrial remedy allows the petitioners to avoid the loss of their right to be free from unlawful searches and seizures performed pretrial.

The State now concedes that RALJ review is an inadequate remedy: "By the time a defendant is tried and convicted, pleads guilty, or is found not guilty or the charge is otherwise dismissed, there would no longer be any value to enforcing any rights concerning pretrial conditions; those conditions would be moot." State Br. at 6. We agree that a RALJ appeal is an inadequate remedy to review pretrial release conditions. Notably, a defendant who prevails in the district court would be unable to pursue postconviction relief, effectively barring any challenge to that person's pretrial

requirements; the constitutional violation would then be unreviewable. Thus, some other form of review must provide the adequate remedy at law.

### 2. A Motion To Amend in the District Court Is Not an Adequate Remedy at Law To Challenge Pretrial Release Conditions

The parties dispute whether a motion to amend pretrial release conditions, brought before the district court, constitutes an adequate remedy at law. The State argues that a motion to amend provides an adequate remedy at law because it allows defendants to bring their concerns to the trial court's attention. *Id.* at 7 ("All of the defendants had an opportunity to raise this issue in the trial court by simply filing a motion [to amend]."). The petitioners respond that (1) a motion to amend would be "futile" because "the district court consistently rejects the petitioners' routine objections to specific pretrial release conditions" and (2) the statute's language and structure requires that an adequate remedy be "available outside the inferior tribunal," not provided by the same court. Reply Br. at 3-4. The petitioners' statutory argument has merit.

A district court can amend its order for pretrial conditions at any time "on change of circumstances, new information or showing of good cause . . ." CrRLJ 3.2(j)(1).[16] A district court reviewing itself, however, is quite different from the form of review envisioned by RCW 7.16.040. The statute describes a process by which the judgment of "an inferior tribunal" is reviewed by a court *other than* a court of limited jurisdiction. RCW 7.16.040. By extension, the statutory scheme does not contemplate a district

---

[16] The trial court noted this option at one of the petitioners' first appearance hearings. RP Cooper at 6 ("[Y]ou can always raise the issue of conditions at any time.").

court's reviewing itself, either through amendment or other form of reconsideration. Therefore, such a motion cannot be considered an adequate remedy at law under RCW 7.16.040.

Having concluded that there is no adequate remedy at law available to review the challenged pretrial release conditions, we proceed to the substance of the petitioners' claims and conclude that the district court committed probable error.

### B. The Trial Court Committed Probable Error Because Petitioners' Urinalysis Pretrial Release Conditions Are Unconstitutional Searches

The heart of this appeal is whether the petitioners' urinalysis testing requirements violate either article I, section 7 of the Washington Constitution or the Fourth Amendment to the United States Constitution. The parties also ask that we determine whether Washington Constitution article I, section 7 is more protective than—and should be interpreted separately from—the Fourth Amendment in this context.

### 1. Article I, Section 7 Provides Greater Protection to Pretrial Defendants' Privacy Rights in Their Bodily Functions

Generally speaking, "[i]t is . . . axiomatic that article I, section 7 provides greater protection to an individual's right of privacy than that guaranteed by the Fourth Amendment." *State v. Parker*, 139 Wn.2d 486, 493, 987 P.2d 73 (1999) (plurality opinion); *City of Seattle v. McCready*, 123 Wn.2d 260, 267, 868 P.2d 134 (1994) ("It is by now commonplace to observe Const. art. 1, § 7 provides protections for the citizens of Washington which are qualitatively different from, and in some cases broader than, those provided by the Fourth Amendment."). Unlike our state constitution, the Fourth Amendment does not explicitly protect a citizen's "private

affairs." *State v. Jones*, 146 Wn.2d 328, 332, 45 P.3d 1062 (2002); *McCready*, 123 Wn.2d at 267. But this enhanced protection depends on the context in question. *See State v. Boland*, 115 Wn.2d 571, 576, 800 P.2d 1112 (1990) (considering anew the relative protections of article I, section 7 and the Fourth Amendment in the context of privacy in personal trash). We have not determined if Washington's Constitution provides broader protection in the specific context of bodily functions and pretrial release conditions.[17]

We have established a "nonexclusive" set of six factors to determine "whether, in a given situation, the Washington State Constitution should be considered as extending broader rights to its citizens than the United States Constitution." *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808 (1986). These factors are:

> (1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern.

*Id.* The first, second, third, and fifth factors "are uniform in any analysis" of article I, section 7, "and generally support analyzing our State constitution independently from

---

[17] Amicus curiae Washington Association of Prosecuting Attorneys (WAPA) suggests that we need not pursue a *Gunwall* analysis; WAPA argues that this court already found pretrial defendants' state constitutional privacy rights to be coextensive with Fourth Amendment privacy protections. *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986); WAPA Amicus Br. at 6. Amicus WAPA cites to *State v. Puapuaga*, 164 Wn.2d 515, 521, 192 P.3d 360 (2008), for the assertion that, "[i]f a condition passes muster under the Fourth Amendment, the condition is also lawful under Const. art. I, sec. 7." WAPA Amicus Br. at 6. *Puapuaga* concerned the constitutionality of an inventory search conducted while the defendant was in state custody. We did not conduct a separate article I, section 7 analysis because "Puapuaga cite[d] only to Fourth Amendment jurisprudence." *Puapuaga*, 164 Wn.2d at 524 n.11. Thus, that case did not inquire into the distinctions between the Fourth Amendment and article I, section 7 protections. As a result, we have yet to answer whether article I, section 7 is more protective than the Fourth Amendment in the present context.

the Fourth Amendment." State Br. at 19; *see also Boland*, 115 Wn.2d at 576 (declining to reconsider these factors because they are uniformly applicable to any article I, section 7 analysis). The parties disagree on whether the two remaining factors—preexisting state law and matters of particular state or local concern—suggest that there are "significant constitutional differences in this area." State Br. at 22. We address the two factors in turn.

### a. *Gunwall* Factor Four: Preexisting State Law

"Previously established bodies of state law, including statutory law, may . . . bear on the granting of distinctive state constitutional rights." *Gunwall*, 106 Wn.2d at 61. Here, the petitioners were subject to urinalysis testing as a condition of pretrial release, so we look to preexisting state law concerning both (a) bodily functions and (b) pretrial release.

The parties agree that preexisting state law was not particularly concerned with the rights of pretrial detainees. *See* Blomstrom Br. at 28 ("Cursory research yielded nothing specific to pretrial release conditions in the late nineteenth century . . . ."); State Br. at 21 ("state concerns over the hardship of pretrial detention did not differ from those expressed in the federal system"). However, this court has already established that bodily functions are entitled to "heightened protection" under article I, section 7. *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 307, 178 P.3d 995 (2008) (lead opinion).[18] Greater protection of bodily functions under state law favors a discrete analysis of article I, section 7. *Gunwall*, 106 Wn.2d at 66.

---

[18] The lead opinion and Justice J.M. Johnson's concurrence agreed in this respect. *York*,

b. *Gunwall* Factor Six: Matters of Particular State or Local Concern

Pretrial release conditions are historically the province of the judicial branch, and rules concerning their deployment have been "developed and maintained by each county's judiciary."[19] *Westerman v. Cary*, 125 Wn.2d 277, 291, 892 P.2d 1067 (1994). Thus, the appropriateness of pretrial release conditions is a matter of particular state and local concern. It follows that article I, section 7 should be applied discretely in this context.[20]

In sum, the combined *Gunwall* factors support a separate analysis of article I, section 7 in the context of urinalysis imposed as a pretrial release condition.

2. Petitioners' Urinalysis Testing Requirements Violate Article I, Section 7

Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." We review claimed article I, section 7 violations in two steps: First, we determine "whether the action complained of constitutes a disturbance of one's private affairs." *State v. Surge*, 160 Wn.2d 65, 71, 156 P.3d 208 (2007) (plurality opinion). "If there is

---

163 Wn.2d at 344 ("Although some federal courts seem unconcerned with the indignity of urine collection, Washington courts recognize our heightened protections from Washington Constitution's article I, section 7 explicit safeguard for 'private affairs.'") (J.M. Johnson, J., concurring).

[19] The State argues that there is no particular local concern in this context because DUI is a traffic crime involving "the streets and highways, and so there is substantially greater interstate potential." State Br. at 22. This approach misstates the topic of inquiry. We are not concerned with article I, section 7's application to DUIs as a general matter. We are concerned with the privacy implications of urinalysis as a pretrial release condition.

[20] Neither party explores whether bodily functions themselves, as implicated by urinalysis testing, are matters of particular state or local concern. But we have previously noted that "we offer heightened protection for bodily functions compared to the federal courts," *York*, 163 Wn.2d at 307, suggesting that bodily functions are, indeed, matters of particular state concern.

no private affair being disturbed, no article I, section 7 violation exists." *Id.* Second, we consider "whether authority of law justifies the intrusion." *Id.*

a. Urinalysis Disturbs the Petitioners' Private Affairs

Here, the State appears to concede the first step of our analysis—that urinalysis testing of the petitioners disturbs their private affairs. *See* State Br. at 25 (describing urinalysis as an "intrusion" that should nonetheless be outweighed by "the governmental interest in protecting the public"). However, the State seeks to minimize the import of suspicionless urinalysis testing by concluding that the testing itself is a "limited incursion." *Id.* at 27. This characterization is surprising. On the contrary,

> [i]t is difficult to imagine an affair more private than the passing of urine. . . . "Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom."

*Robinson v. City of Seattle*, 102 Wn. App. 795, 818, 10 P.3d 452 (2000) (internal quotation marks omitted) (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 617, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989)). In the context of a state-ordered search, urine testing "is 'particularly destructive of privacy and offensive to personal dignity.'" *York*, 163 Wn.2d at 327 (Madsen, J., concurring) (quoting *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 680, 109 S. Ct. 1384, 103 L. Ed. 2d 685 (1989) (Scalia, J., dissenting)); *cf. Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995) (finding urine testing of student athletes to be a minimal intrusion because students routinely undress and shower in

communal locker rooms).[21] In comparison, we have deemed roadblocks to be "highly intrusive," *City of Seattle v. Mesiani*, 110 Wn.2d 454, 458, 755 P.2d 775 (1988), and pat-down searches to be "highly intensive," *Jacobsen v. City of Seattle*, 98 Wn.2d 668, 674, 658 P.2d 653 (1983). Urinalysis is at least as invasive as a roadblock or a pat-down search.[22] We thus conclude that court-ordered urinalysis testing constitutes an acute privacy invasion by the State.

b. The Petitioners' Urinalysis Requirements Lack Authority of Law

With respect to the second step of our analysis—the relevant authority of law—the question is less straightforward. "Authority of law" may be satisfied by a valid warrant, a recognized exception to the warrant requirement,[23] a constitutional statute, or a court rule.[24] *See Gunwall*, 106 Wn.2d at 68-69 ("[T]he 'authority of law' required

---

[21] In *Acton*, the collection procedures did not involve the observation of another person's genitals during urination. 515 U.S. at 650.

[22] The dissent concludes that urinalysis is a narrowly tailored means of preventing a person charged with DUI from reoffending. Dissent at 9-10. However, the State bears the burden of demonstrating that an invasion of privacy is narrowly tailored. The State's action is narrowly tailored when the State "has selected the 'less drastic means' for effectuating its objectives." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 343, 92 S. Ct. 995, 31 L. Ed. 2 274 (1972) ("[I]f there are other, reasonable ways to achieve [a State's] goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference.")). Rather than meeting this substantial burden, the State appears to have conceded that there are less invasive means of achieving the same ends. State Br. at 25 (referencing "several alternatives that are less intrusive searches," but rejecting these alternatives because they are "more expensive and inconvenient").

[23] Recognized exceptions to the warrant requirement "include 'exigent circumstances, consent, searches incident to a valid arrest, inventory searches, the plain view doctrine, and *Terry* [*v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)] investigative stops.'" *York*, 163 Wn.2d at 310 (quoting *Robinson*, 102 Wn. App. at 813).

[24] Indeed, it appears that the framers intended to give both the legislature and the courts the ability to provide the law authorizing the disturbance of a citizen's private affairs. Charles W. Johnson & Scott P. Beetham, *The Origin of Article I, Section 7 of the Washington State Constitution*, 31 SEATTLE U. L. REV. 431, 449 (2008).

by Const. art. 1, § 7 in order to obtain records includes authority granted by a valid, (*i.e.*, constitutional) statute, the common law or a rule of this court."); *see also McCready*, 123 Wn.2d at 273 (recognizing "that well-established principles of the common law may in some cases be sufficient to provide the authority of law required" by article I, section 7); *State v. Reeder*, 184 Wn.2d 805, 817, 365 P.3d 1243 (2015) (finding that judicially reviewed subpoenas provide sufficient authority of law). In this case, none of these options provides adequate authority.

### i. No Statute or Court Rule Provides the Necessary Authority of Law

No party suggests that a constitutional statute or court rule provides authority of law sufficient under article I, section 7 to require periodic urinalysis as a condition of pretrial release. Despite this implicit concession, "'[w]e may affirm the [lower] court on any grounds established by the pleadings and supported by the record.'" *In re Marriage of Rideout*, 150 Wn.2d 337, 358, 77 P.3d 1174 (2003) (alterations in original) (quoting *Truck Ins. Exch. v. VanPort Homes, Inc.*, 147 Wn.2d 751, 766, 58 P.3d 276 (2002)). However, it is not clear that any statute or court rule would provide adequate authority of law necessary to affirm in this case.

First, RCW 10.21.055 (in force at the time of the petitioners' hearings) is clearly inapposite; it applies only to persons with a prior conviction for DUI or a similar crime where the current charge involves alcohol. ENGROSSED SECOND SUBSTITUTE S.B. 5912, at 1-2, 63d Leg., 2d Spec. Sess. (Wash. 2013). None of the petitioners here had a prior DUI conviction or a current charge involving alcohol.

Second, RCW 10.21.030 provides, at best, ambiguous authority; the title of the act ("Relating to bail for *felony* offenses") and the enacted statement of legislative intent (requiring "conditions of release for persons in custody for *felony*") states that the law applies to felony offenses only. H.B. 2625, at 1, 61st Leg., Reg. Sess. (Wash. 2010) (emphasis added). The petitioners here were charged with misdemeanors, not felony offenses.

And third, CrRLJ 3.2(d) does not apply because the district court did not find that the petitioners would likely (a) commit a violent crime, (b) intimidate witnesses, or (c) otherwise interfere with the administration of justice, before proceeding to impose conditions under that provision's subheading, CrRLJ 3.2(d)(10). No statute or holding of this court has deemed DUI to be a violent crime, and DUI does not fit the ordinary meaning of "violent" and "violence."[25] *Webster's* defines "violence" as "exertion of any physical force *so as to* injure or abuse." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2554 (2002) (emphasis added). The phrase "so as to" suggests deliberate action undertaken in order to cause harm—an affirmative or even premeditated use of force not applicable to DUI.

---

[25] The dissent would conclude that DUI is a violent crime because vehicular homicide and vehicular manslaughter are violent crimes. Dissent at 6-7. The dissent particularly relies on RCW 9.94A.030; however, RCW 9.94A.030 references vehicular homicide and vehicular assault, not DUI. These are separate offenses. We do not and need not comment on whether crimes not before this court are violent offenses; we conclude merely that DUI, alone, is not a violent crime. And where the dissent urges this court to grant deference to a trial court's determination that a particular offense is violent, we note only that no court has deemed DUI a violent offense in this case. *See* dissent at 6. Instead, the trial court merely referenced "public safety" generally as the basis for imposing the pretrial release conditions.

Because these statutes and court rules do not allow us to affirm the trial court, we proceed to the other authority of law proposed by the State—a new exception to the warrant requirement.

### ii. We Decline To Adopt the Federal Special Needs Exception

As a preliminary matter, the parties seem to agree that petitioners' urinalysis testing conditions constitute warrantless searches not subject to a recognized exception to the warrant requirement. *See* State Br. at 23-24 ("[B]ecause the testing imposed on the defendants was not for law enforcement purposes, it does not fall within any of [the] commonly analyzed exceptions."); *see also* Blomstrom Br. at 31. The parties part ways on whether this court should apply a state equivalent to the federal "special needs" exception to the warrant requirement. State Br. at 24 ("[T]he inquiry here *must* be akin to the special needs exception under Federal law.").

The federal special needs exception permits an otherwise unlawful search "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985) (Blackmun, J., concurring in judgment)). The government must show (1) a purpose outside of general law enforcement, (2) that this purpose makes obtaining a warrant or probable cause impracticable, and (3) that this purpose outweighs the privacy interest infringed. *Skinner*, 489 U.S. at 619.

This court has not explicitly recognized a special needs exception under article I, section 7. *York*, 163 Wn.2d at 314 ("[W]e have not created a general special needs exception or adopted a strict scrutiny type analysis that would allow the State to depart from the warrant requirement whenever it could articulate a special need beyond the normal need for law enforcement. . . . [S]uch an alleged exception cannot be found in the common law."). We have, however, occasionally upheld suspicionless searches in limited cases, particularly where we rely entirely on federal law, in the context of criminal investigations, or when dealing with persons already convicted or otherwise having received the benefit of a full adversarial proceeding. *Id.* at 315.

For instance, in *State v. Meacham*, we upheld mandatory blood tests of putative fathers ordered "after full adversary hearings." 93 Wn.2d 735, 739, 612 P.2d 795 (1980). In *In re Juveniles A, B, C, D, E*, we upheld mandatory HIV (human immunodeficiency virus) testing of convicted sexual offenders, engaging solely in a federal analysis. 121 Wn.2d 80, 90, 100, 847 P.2d 455 (1993). In *State v. Olivas*, we upheld blood testing of convicted felons without individualized suspicion. 122 Wn.2d 73, 83, 856 P.2d 1076 (1993). And in *Surge*, we held that DNA sampling of convicted felons did not violate article I, section 7. 160 Wn.2d at 82.

A plurality of this court emphasized these cases' narrow application in *York*. 163 Wn.2d at 316 (holding that random drug testing of student athletes violated article I, section 7). In *York*, the lead opinion declined to adopt a special needs exception under article I, section 7; however, that decision left the door open to adopting such an exception in the future. *See id.* at 329 ("The special needs exception is consistent

with well-established common law principles governing warrantless searches and, thus, comports with article I, section 7." (Madsen, J., concurring)).

Most recently, in *State v. Olsen,* this court upheld suspicionless urinalysis testing of misdemeanant probationers. 189 Wn.2d 118, 399 P.3d 1141 (2017). In *Olsen,* the State similarly urged this court to adopt the federal special needs exception. We again declined, instead adopting a balancing test: "narrowly tailored" searches to further a "compelling" state interest are permissible "because probationers have a reduced expectation of privacy." *Id.* at 126 (noting that, with such reduced privacy expectations, "the State does not need a warrant, an applicable warrant exception, or even probable cause to search a probationer"). In adopting this new approach, we emphasized "probationers' significantly reduced expectation of privacy and the unique rehabilitative goals of the probation system." *Id.* at 128.

In contrast to these prior holdings, this case concerns the prophylactic testing of defendants charged but not yet convicted. The State now suggests that these persons—charged but presumed innocent—have a reduced privacy interest as well. Answer of Resp'ts to Brs. of Amici Curiae at 5. While the State offers no authority for this assertion, it references the Washington State Association of Prosecuting Attorneys (WAPA) amicus brief generally. *Id.* The WAPA amicus brief, in turn, relies on *Puapuaga,* 164 Wn.2d 515, for its assertion that the privacy expectations of a pretrial releasee are the same as those of "an individual who is detained in jail pending trial." WAPA Amicus Br. at 5. This misstates our holding in *Puapuaga.*

In *Puapuaga*, the defendant challenged an inventory search conducted while he was detained and in state custody. 164 Wn.2d at 517. We noted that "an inmate's expectation of privacy is necessarily lowered *while in custody.*" *Id.* at 523 (emphasis added). Physical custody by the State involves unavoidable administrative burdens that, of necessity, work some invasion of privacy. We have not yet commented on the privacy expectations of a defendant released on her own recognizance.

Nor have other courts clearly defined the privacy status of pretrial releasees, in contrast with pretrial detainees—though most agree that persons not yet convicted have substantially greater privacy rights than probationers.[26] Indeed, the privacy interests of detainees and releasees appear to differ to the extent required by the adjudicative process. For instance,

> [i]f you are arrested, you expect that officers will disarm you, booking personnel will extract identifying information, and jail personnel will inventory your belongings—because these intrusions are necessary for the system to work. But it is that necessity that justifies the intrusions, not your subjective expectations.

---

[26] *Compare Scott,* 450 F.3d at 873 ("People released pending trial, by contrast [to probationers], have suffered no judicial abridgment of their constitutional rights."), *with id.* at 885 (Bybee, J., dissenting) ("Scott's reasonable expectation of privacy may be somewhat greater than that of a probationer, parolee, or presentence releasee, but it is less than that of an 'ordinary citizen'"); *see also United States v. Kills Enemy,* 3 F.3d 1201, 1203 (8th Cir. 1993) (contrasting the rights of pretrial releasees and convicted persons: "A convicted person awaiting sentence is no longer entitled to a presumption of innocence or presumptively entitled to his freedom"); *State v. Jane Doe,* 149 Idaho 353, 358, 233 P.3d 1275 (2010) (citing *Scott* with approval for the proposition that "a diminished expectation of privacy . . . only applies to offenders"). *But see Norris v. Premier Integrity Sols., Inc.,* 641 F.3d 695, 699-701 (6th Cir. 2011) (concluding that pretrial releasee had reduced expectation of privacy because he "agreed to random drug testing as a condition of his pretrial release" and because he participated "in the highly government controlled and regulated" pretrial release program").

Sandra G. Mayson, *Bail Reform and Restraint for Dangerousness: Are Defendants a Special Case?*, U. OF PA. L. SCH., PUB. L. RES. PAPER NO. 16-30, at 28-29 (last revised May 18, 2017) (YALE L.J., forthcoming), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2826600 [https://perma.cc/HRT6-2RAD]. Thus, even taking up the State's belated and unsupported argument concerning the petitioners' privacy interests, we disagree. The petitioners suffered no diminution of their privacy rights that might justify importing the federal special needs test into our article I, section 7 analysis.

In sum, we decline to import the federal special needs test in this context. The petitioners suffered no diminution in their privacy sufficient to justify highly invasive urinalysis testing under article I, section 7. We therefore hold that the superior court erred in failing to grant the petitioners' applications for statutory writs and in failing to find that the pretrial urinalysis testing violated article I, section 7 of the Washington Constitution.

IV. The Petitioners' Motion To Strike Is Denied

By separate motion, the petitioners ask this court to exclude from consideration the declaration of Paul Abbott and to strike references made to it "in the State's amicus curiae brief." We deny the motion.

The declaration at issue was attached to the State's motion for leave to file an amicus brief. It was cited solely in the "Applicant's Interest" section and appears to have been offered to help this court determine only whether the State was justified in

filing an amicus brief. It was not cited in the State's amicus brief, as the motion to strike claims.

The petitioners argue that we should strike the declaration and the associated (nonexistent) references in the State's amicus brief "because the facts it seeks to bring to [this court's] attention do not help this court resolve the issues before [it]." *In re Adoption of B.T.*, 150 Wn.2d 409, 414, 78 P.3d 634 (2003) (rejecting new evidence that does "not help us resolve the issues before us").

The petitioners are mistaken. In bringing a motion to file an amicus brief, the State was responsible for explaining its interest in the issue on which it hoped to offer guidance. Here, the State specifically sought leave to file an amicus brief concerning IIDs and whether this court should reach the issue of their constitutionality. The fact that the State frequently imposes IID requirements, therefore, logically supports the State's interest in any decision concerning their constitutionality. For this limited purpose, the Abbot Declaration did, in fact, "help [this court] resolve the issue[] before [it]"—whether the State had an adequate interest in filing an amicus concerning IIDs. *See id.*

Because the declaration was appropriately included for the limited purpose of explaining the State's interest in filing an amicus brief, we deny the motion to strike.

## CONCLUSION

The superior court erred in failing to grant the petitioners' applications for statutory writs. The petitioners lack an adequate remedy at law to challenge pretrial release conditions. And the petitioners' urinalysis testing conditions violated article I, section 7 of the Washington Constitution because they suffered no diminution in their privacy interests sufficient to justify highly invasive urinalysis testing. We therefore reverse and remand to the superior court for further proceedings consistent with this opinion.

Wiggins, J.

WE CONCUR.

Stephens, J.

González, J.

Owens, J.

No. 91642-0

GONZÁLEZ, J. (dissenting in part)—Cortney Blomstrom, Brooke Button, and Christopher Cooper were each arrested for driving under the influence (DUI). After finding probable cause for DUI and weighing the evidence in each case, the court imposed random urinalysis as a condition of release pursuant to CrRLJ 3.2.[1] The majority finds random urinalysis to be an unconstitutional condition of release under article I, section 7 of our state constitution. Once an individual has been arrested on probable cause for certain offenses, such as DUI, courts have the authority to prohibit drug and alcohol use. CrRLJ 3.2(d). Monitoring this prohibition through random urinalysis reduces the possibility that a defendant will reoffend on pretrial release. I agree with the majority's resolution of the other issues in this case, but its interpretation of article I, section 7 usurps the authority of the courts to impose pretrial release conditions. I respectfully dissent.

"No person shall be disturbed in his [or her] private affairs . . . without authority of law." WASH. CONST. art. I, § 7. "Private affairs" include privacy in

---

[1] "If the court determines that personal recognizance will not assure the defendant's appearance at future court proceedings or if there is a likely danger the defendant will commit a violent crime, seek to intimidate witnesses, or 'otherwise unlawfully interfere with the administration of justice,' then the court will impose bail or conditions of release." *Harris v. Charles*, 171 Wn.2d 455, 468, 256 P.3d 328 (2011) (quoting CrR 3.2(a)(1)-(2)).

bodily functions; and urinalysis intrudes on this privacy interest. *State v. Olsen*, 189 Wn.2d 118, 124, 399 P.3d 1141 (2017). The only time that the State may intrude upon private affairs is when the State has "'authority of law.'" *State v. Gaines*, 154 Wn.2d 711, 718, 116 P.3d 993 (2005). In *Olsen*, we held that courts have "'authority of law'" to impose random urinalysis as a condition of probation, because probationers have a diminished expectation of privacy. 189 Wn.2d at 126. Because these conditions intruded in private affairs, we limited that "authority of law" to when the conditions advance the State's compelling interests and are narrowly tailored. *Id.* Similarly, defendants arrested on probable cause for a dangerous offense have a diminished expectation of privacy and courts have "authority of law" under CrRLJ 3.2 to impose necessary, narrowly tailored release conditions. *See generally Maryland v. King*, __ U.S. __, 133 S. Ct. 1958, 1978, 186 L. Ed. 2d 1 (2013) ("Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, . . . his or her expectations of privacy and freedom from police scrutiny are reduced.").

CrRLJ 3.2 empowers judges to impose conditions to assure a defendant's appearance at trial and to protect public safety, including conditions to monitor drug or alcohol use. Defendants are in the court's custody and subject to supervision; to the extent necessary to impose CrRLJ 3.2 conditions, defendants

2

have less of a privacy interest than the general population.[2] *See also Albright v. Oliver*, 510 U.S. 266, 277-78, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (Ginsburg, J., concurring) ("At common law, an arrested person's seizure was deemed to continue even after release from official custody."); *State v. Smith*, 84 Wn.2d 498, 501, 527 P.2d 674 (1974) (The "'[a]uthority to grant bail generally is incidental either to the power to hold a defendant to answer, or to the power to hear and determine the matter in which the defendant is held.'" (quoting 8 AM. JUR. 2D *Bail and Recognizance* § 8, at 787-88 (1963)).

Although courts are authorized to hold an accused in custody pending trial upon a finding of wrongdoing by probable cause, our state recognizes the significant effects pretrial detention can have on an accused. An accused "in pretrial detention 'is severely handicapped in his [or her] defense preparation' and 'is often unable to retain his [or her] job and support his [or her] family, and is made to suffer the public stigma of incarceration even though he [or she] may later be found not guilty.'" *Harris v. Charles*, 171 Wn.2d 455, 468, 256 P.3d 328 (2011) (quoting CRIM. RULES TASK FORCE, WASHINGTON PROPOSED RULES OF

---

[2] In *York v. Wahkiakum School District No. 200*, we held that even though students have a diminished expectation of privacy in the school setting and the State has an interest in testing students' urine for drugs, the State could not administer urine tests without an individualized suspicion. 163 Wn.2d 297, 308, 178 P.3d 995 (2008) (plurality opinion). In these DUI cases, pretrial conditions are based on individualized suspicion because of the probable cause finding.

CRIMINAL PROCEDURE Rule 3.2, cmt. at 22 (1971)); *accord* ABA, STANDARDS FOR CRIMINAL JUSTICE, PRETRIAL RELEASE std. 10-1.1 (2007).

Bail and other pretrial release programs seek to alleviate those harsh consequences of pretrial detention. While the primary function of bail is to ensure an accused's appearance at court, courts are allowed to pursue other compelling interests through regulation of pretrial release. *United States v. Salerno*, 481 U.S. 739, 753, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987); *In re Habeas Corpus of York*, 9 Cal. 4th 1133, 1145, 892 P.2d 804, 40 Cal. Rptr. 2d 308 (1995). Public safety is one such compelling interest.

But what qualifies as permissible governmental considerations is not without limitation. This is because pretrial releasees have not been convicted beyond a reasonable doubt to have committed the offense for which they are charged. This means pretrial conditions cannot be punitive in nature. *See Harris*, 171 Wn.2d at 468-69. At the pretrial stage, the government's interests in detaining an accused are limited to ensuring the accused's appearance at trial, safeguarding the administration of justice, and protecting the public from harm. *See Schall v. Martin*, 467 U.S. 253, 263, 281, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984) (upholding pretrial detention based on "'serious risk'" that the accused might commit a crime if released). A logical corollary to this rule is that the accused's pretrial liberty and privacy interests are diminished to the extent necessary to

4

"maintain[] the integrity of the judicial process by securing defendants for trial, and protecting victims, witnesses and the community from threat, danger or interference." STANDARDS std. 10-1.1.

The court rules governing pretrial release by courts of limited jurisdiction reflect these competing governmental and private interests. First, before the court can impose pretrial conditions, it must find probable cause of wrongdoing; otherwise, "the accused shall be released without conditions." CrRLJ 3.2. Second, once the court finds the charge is supported by probable cause, the court must release the accused unless the charged offense is a capital offense, there are concerns the accused will not appear at court, or there is a likely danger that the accused will commit a violent crime, seek to intimidate witnesses, or otherwise unlawfully interfere with the administration of justice while on release. CrRLJ 3.2(a). In this context, however, the term "violent crime" is very broadly defined and includes misdemeanor offenses. If the court finds there is a "likely" or "substantial" danger the accused will commit a violent crime, only then may the court impose pretrial release conditions "[p]rohibiting the accused from . . . possessing or consuming any intoxicating liquors or drugs not prescribed to the accused" or "any condition other than detention to assure noninterference with the administration of justice and reduce danger to others or the community." CrRLJ 3.2(a)(2); 3.2(d)(3), (10). Because the governmental interests considered under

5

CrRLJ 3.2 mirror the considerations for bail, a rule authorized under CrRLJ 3.2 is necessarily authorized under the court's common law bail powers as well.

To protect public safety, CrRLJ 3.2 specifically authorizes courts to impose conditions "prohibit[ing] the accused from . . . possessing or consuming any intoxicating liquors or drugs not prescribed to the accused." CrRLJ 3.2(d)(3). Random urinalysis is "a crucial monitoring tool that is limited in scope when imposed only to assess compliance with a valid prohibition on drug and alcohol use." *Olsen*, 189 Wn.2d at 130. When imposing conditions, judges should consider, among other factors, the defendant's criminal record and the nature of the charge. CrRLJ 3.2(e). However, in one fell swoop, the majority removes a judge's ability to impose release conditions on DUI defendants.

The majority says that CrRLJ 3.2 does not provide "authority of law" to impose random urinalysis because a DUI is not listed as a violent offense under RCW 9.94A.030 and is not "deliberate action undertaken in order to cause harm." Majority at 26-27. There is no need to resort to the dictionary in this case. DUI as a first offense is a gross misdemeanor, but CrRLJ 3.2(a) specifically says "'violent crimes' may include misdemeanors and gross misdemeanors and are not limited to crimes defined as violent offenses in RCW 9.94A.030." This evinces an intent for a broad definition of "violent" that is deferential to a trial judge's determination that a crime is violent. In addition to DUI, stalking (RCW 9A.46.110), assault in

the fourth degree (RCW 9A.36.041), coercion (RCW 9A.36.070), reckless burning

(RCW 9A.48.050), reckless endangerment (RCW 9A.36.050), and animal cruelty

in the second degree (RCW 16.52.207) are all gross misdemeanors and are all

potentially violent offenses.[3]

The legislature's definition of "violent offense" is also instructive because it

says vehicular assault and homicide while under the influence of intoxicating

liquor or any drug are violent crimes. RCW 9.94A.030(55)(xiii), (xiv). Under the

majority's restrictive definition, vehicular homicide by intoxication is not a

"violent crime." RCW 9.94A.030 conclusively shows that this is not the case: the

legislature determined that both vehicular assault and homicide, when "caused by

the operation or driving of a vehicle by a person while under the influence . . ." is a

"violent offense." *Id.* The State is not required to prove a causal connection

between intoxication and the resultant harm for vehicular homicide by intoxication.

*State v. Rivas*, 126 Wn.2d 443, 453, 896 P.2d 57 (1995). The crimes cannot be

meaningfully distinguished for CrRLJ 3.2 purposes—the impaired driver's

---

[3] At common law, an officer could not make warrantless arrests for a misdemeanor unless the misdemeanor was committed in the presence of the officer or the misdemeanor amounted to a "breach of the peace." A "breach of peace includes at the very least a 'threat of violence.'" *State v. Walker*, 157 Wn.2d 307, 326, 138 P.3d 113 (2006) (Chambers, J., concurring). RCW 10.31.100 codifies the common law rule and creates additional exceptions, including DUI. "These exceptions reflect the legislature's determination that the need for immediate arrest outweighs the possibility of a mistaken arrest." *Id.* at 316.

7

disregard for foreseeable harm makes DUI a violent crime, not the resultant harm.[4]

*See also State v. Stately*, 152 Wn. App. 604, 609, 216 P.3d 1102 (2009) (vehicular

homicide by intoxication and homicide by recklessness are violent offenses, while

vehicular homicide by disregard is not).

A court has authority to impose pretrial release conditions that protect the

public from new DUI's, i.e., violent crime, because probable cause for DUI is

evidence that the defendant may reoffend. Blomstrom and Cooper stipulated to

probable cause for DUI and the court found probable cause for Button's DUI.

Pet'rs' Opening Br. at 4, 6, 9; *cf. State v. Jorgenson*, 179 Wn.2d 145, 149, 312

P.3d 960 (2013) ("We defer to the legislature's conclusion that when a trial judge

finds probable cause to believe a defendant committed a serious offense, public

safety justifies temporarily limiting that person's right to possess arms."). Thus,

each of them had a diminished expectation of privacy and the court had authority

under CrRLJ 3.2 to impose random urinalysis after considering the factors listed in

CrRLJ 3.2(e).[5]

As in *Olsen*, "authority of law" overcomes a defendant's diminished

expectation of privacy when the State has a compelling interest to impose narrowly

---

[4] The majority seems to hold onto an anachronistic view of DUI by requiring a causal connection between harm and DUI, which the legislature rejected in 1991. *See generally State v. Salas*, 127 Wn.2d 173, 181, 897 P.2d 1246 (1995).

[5] Courts prohibit drug and alcohol use on this same basis. Surely, the majority is not saying the court lacks authority to prohibit drug and alcohol use on a DUI defendant's pretrial release.

tailored conditions. 189 Wn.2d at 127; *see also Maryland*, 133 S. Ct. at 1979 (if "privacy-related concerns are weighty enough . . . the search may require a warrant"). The public safety risk posed by pretrial defendants is no less "substantial," *Olsen*, 189 Wn.2d at 128, than that of a probationer. In these cases, the judge imposed individualized conditions with a nexus between the recent illegal activity and the means for reoffending—probable cause for DUI coupled with continued drug and alcohol use. The judge's decision was supported by Blomstrom's two breath samples, which revealed alcohol concentrations of 0.191 and 0.184; Cooper's breath sample of 0.175; and Button's previous DUI conviction. Br. of Resp'ts at 17-18. The judge also relied on studies that show the majority of fatal crashes involved drivers with alcohol concentrations of 0.15 or greater. *See, e.g.*, NAT'L HIGHWAY & TRAFFIC SAFETY ADMIN., U.S. DEP'T OF TRANSP., PUB. NO. 811870, TRAFFIC SAFETY FACTS: ALCOHOL-IMPAIRED DRIVING: 2012 DATA (Dec. 2013). The State has a compelling interest to protect the public from DUI reoffenders.

"Trial courts must make difficult decisions when competing interests clash." *Aiken v. Aiken*, 187 Wn.2d 491, 494, 387 P.3d 680 (2017). To be narrowly tailored, release conditions must both respect a defendant's privacy interests and preserve the State's ability to protect the public. Notably, when a court imposes a random urinalysis as a pretrial release condition, the search is not one where the

government expects or hopes to find anything. Courts impose random urinalysis on defendants for the limited purpose of monitoring drug and alcohol use and preventing crime. Urinalysis is not a punitive measure, nor does it permit fishing expeditions. *Olsen* offers additional reasons why random urinalysis is narrowly tailored. *See* 189 Wn.2d at 130-33. Ultimately, the preferred method of monitoring should be decided on an individualized basis, as these narrowly tailored conditions were. A reviewing court's ability to imagine a "less invasive means of achieving the same ends," majority at 25 n.22, does not divest judges of the authority to impose reasonable CrRLJ 3.2 conditions to protect the public from impaired driving. *See also Salerno*, 481 U.S. at 754 ("[the] proposed conditions of release . . . [cannot] be 'excessive' in light of the perceived evil").

Judges should not be categorically prohibited from imposing necessary and narrowly tailored release conditions on defendants arrested on probable cause for DUI. I respectfully dissent.

González, J.

Gu, J.

Madsen, J.

Fairhurst, C.J.